[Cite as *In re R.D.B.*, 2019-Ohio-1547.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: R.D.B.

:
:
:
:
:
:
:
:
:
:
:
:
:

Appellate Case No. 28122

Trial Court Case No. 2010-10146

(Appeal from Common Pleas Court –
Juvenile Division)

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of April, 2019.

. . . . . . . . . . .

JAMES R. KIRKLAND, Atty. Reg. No. 0009731, 10532 Success Lane, Dayton, Ohio
45458
        Attorney for Appellant-Aunt

Father, Dayton, Ohio
        Appellee, Pro Se

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} The maternal aunt ("Aunt") of R.D.B., a minor, appeals from the trial court's judgment overruling her objections to a magistrate decision that awarded custody of R.D.B. to his biological father ("Father"), and further adopted the magistrate's decision. The judgment of the trial court will be affirmed.

### Factual and Procedural Background

{¶ 2} Mother gave birth to R.D.B. in April 2006. When R.D.B. was four or five years old, Father first learned that R.D.B. was his biological son, a fact confirmed through genetic testing performed after Mother filed a complaint in the Montgomery County Common Pleas Court, Juvenile Division, to determine R.D.B.'s paternity. Thereafter, Father paid court-ordered child support for R.D.B. Father and R.D.B. also began to "spen[d] time together," including time with Father's other sons and daughters (R.D.B.'s half-siblings). Father and Mother did not have a formal visitation schedule in place, but Mother permitted Father to call and arrange to pick up R.D.B. "pretty much * * * anytime [Father] wanted," including for overnight visits.

{¶ 3} Mother died of leukemia on November 1, 2015. Following Mother's death, Aunt, Mother's sister, assumed the care of R.D.B. and his half-brother, S.S., one of Mother's two older sons, in Aunt's Montgomery County home. Father apparently gave informal consent to Aunt's having temporary custody,[1] but thereafter, Father and Aunt filed competing motions for custody of R.D.B.[2]

---

[1] The timing and form of Father's consent are unclear, but the record does make clear that Father did not relinquish his parental rights (*see* Tr. p. 8), and Aunt does not contend that Father ceded permanent custody to her.

[2] Aunt apparently filed two motions: one for "change" of custody and one for "legal"

**{¶ 4}** On September 8, 2016, a juvenile court magistrate conducted a custody hearing at which Father and Aunt appeared, both represented by counsel. Father, a Montgomery County resident, testified that after Mother's death, Aunt initially did not permit Father to see R.D.B., but Aunt and Father eventually arrived at an arrangement that allowed Father to have visitation on an alternating three day/two day weekly schedule. Father stated that his child support obligation was current when it was terminated due to Mother's death. Asked why he was seeking custody, Father explained:

> After the passing of his mom, he's my child, and I feel that I can provide him
>
> with what he needs. And it's not that [Aunt] can't, it's just he's my son, and
>
> I feel like I have the right to raise my child.

(Transcript ("Tr.") p. 10).

**{¶ 5}** Father testified that he was prepared to provide financial, emotional, and spiritual support for R.D.B. While he acknowledged that, since Mother's death, R.D.B. had told Father that he (R.D.B.) did not want to spend the night with Father, did not want to live with Father, and felt "comfortable" living with Aunt, Father expressed optimism that he and R.D.B. could make living together work.

**{¶ 6}** On cross-examination, Father indicated that he worked an 11 p.m. to 7 a.m. shift at his current full-time job, where he earned $24 per hour. Father said he would transfer to a 7 a.m. to 3 p.m. shift if awarded custody of R.D.B. Father also worked as a high school and college basketball referee for approximately 35 games per year, but said he would reduce his refereeing schedule if granted custody. Father agreed that he had failed to respond to Aunt's discovery requests or to appear for his scheduled deposition

custody.

in the custody case, but suggested that such failure was due at least in part to the withdrawal of his original attorney.

{¶ 7} Father testified that he had four children in addition to R.D.B. Father never had legal custody of his three oldest children, all of whom were now adults, but one of those children did live with Father from age 14 to age 18. He also had an 11-year-old daughter who had lived with her mother since Father and the girl's mother divorced in 2013. Father said that a visitation order never was necessary as to his other children, as he and the children's mothers agreed to visitation. Father said that R.D.B. and Father's other children "all get along well," and that R.D.B. "adores" Father's youngest daughter, who is about R.D.B.'s age. Father acknowledged that R.D.B. and S.S., Mother's other son who lived with Aunt, also "get along." Father said that he had attended two or three programs at R.D.B.'s school, but he did not know the names of R.D.B.'s teachers or counselor, and R.D.B.'s friends and basketball teammates never had been to Father's home.

{¶ 8} Father acknowledged that he once dropped R.D.B. for a haircut at a home-based barber shop where R.D.B. said he became "scared" because, while Father was gone, other people rolled a substance in paper that smelled "funny" when smoked. Father claimed that the smell was from a cigar. He said he called the barber after he learned of the incident and was satisfied with the barber's explanation, but Father never returned there with R.D.B.

{¶ 9} Aunt testified that she and her husband had their own 12-year-old and 7-year-old sons. As R.D.B.'s godmother, she and her family had "always been a part of" R.D.B.'s life; her sons and R.D.B. were "cousins, but they act like brothers." After Mother's

death, R.D.B. and S.S. moved in with Aunt. R.D.B. remained in his existing elementary school for the rest of that school year, but the following year transferred to a different school in the same school district yet nearer Aunt's home.

{¶ 10} Aunt described R.D.B. as "a very good child" and "a straight-A student" who played basketball on an organized team and with neighborhood friends at the park. She took R.D.B. to birthday parties and to church. Aunt said R.D.B.'s school communicated with her when R.D.B. had a "rough day" after Mother's death, and Aunt "set him up" with a counselor who had monthly lunches with a group of students at R.D.B.'s current school. Aunt said R.D.B. declined other counseling.

{¶ 11} Aunt testified that Father had attended "three or four" of R.D.B.'s basketball games since Mother's death, but Aunt was not aware of Father's otherwise engaging with R.D.B.'s school work or activities. She said Father had requested changes to their agreed visitation schedule "maybe seven different times," and R.D.B. also had "requested not to have [visitation with Father] at times." Aunt described R.D.B. as "crying" when he told her about being "scared" by the incident at the barber shop. Aunt was concerned that Father had left R.D.B. alone at that home, and she discussed the incident with Father at one of R.D.B.'s basketball games.

{¶ 12} Aunt did not know Father's family, but said that R.D.B. was "involved in a lot of * * * activities" with her family, including R.D.B.'s grandparents, aunts, uncles, and "at least 20 cousins" among Mother's relatives. Aunt stated that she wanted R.D.B. "to have a relationship" with Father and had tried "to facilitate some visitation," but did not "think they're emotionally really close." Aunt reported that R.D.B. "would cling to [her] and hold [her] and not want to go" when Father first came to pick up R.D.B. for visits, and still

sometimes "did not want to go" for visits with Father. Aunt also said R.D.B. told her "at least a couple times a week" that he did not want to live with Father. She stated that R.D.B. spent one night at Father's house while living with Aunt, but returned "crying;" R.D.B. said he told Father he felt "uncomfortable" and "wanted to [go] home" (to Aunt's house), but Father told R.D.B. to "knock it off." R.D.B. had not spent a night with Father since that incident.

{¶ 13} Aunt said that, since Mother's death, R.D.B. had "a lot of days when * * * he's just upset." She testified that R.D.B. cries, "gets mad," and says "he's afraid that he's going to have to move." Aunt said that she had no plans to move and intended to keep R.D.B. enrolled in Kettering schools.

{¶ 14} Similar to Father's work situation, Aunt's job required her to work from 11 p.m. to 7:30 a.m. Aunt's husband, "a stay-at-home dad," woke the children and prepared breakfast for them. Aunt arrived home in time to take R.D.B. and her younger son to school. On cross-examination, Aunt said that she slept from about 8:20 a.m. to 2:15 p.m., and was awake when the children returned home from school. She said she adjusted her sleep schedule in the summer and on holidays when the children were not in school.

{¶ 15} On September 9, 2016, the magistrate issued a decision granting legal custody of R.D.B. to Father, effective immediately, and granting Aunt a "Standard Order of Parenting Time." Aunt filed objections to that decision.

{¶ 16} On August 14, 2018, the trial court overruled Aunt's objections. The court granted Father's motion for custody, denied Aunt's motions for custody, and ordered Father to pay Aunt's attorney's fees for a missed deposition.

**{¶ 17}** Aunt filed a motion to stay the trial court's judgment[3] and filed this appeal, asserting three assignments of error:

1) The trial court abused its discretion by failing to grant custody of R.D.B. to his maternal aunt based on overwhelming evidence that support [sic] R.D.B.'s best interest should remain in the care of his maternal aunt.

2) The trial court abused its discretion by failing to find the father unsuitable to parent the child in its August 14, 2018 [order,] when the father has not visited nor communicated with the child since April 2017.

3) The trial court abused its discretion by failing to timely prepare a decision that goes against the manifest weight of the evidence finding for [sic] the best interest of the child is served in the custody of the aunt.

### Assignments of Error #1 & #2 – Best Interest of Child/Unsuitable Parent

*a. Standard of Review*

**{¶ 18}** An appellate court will not reverse a juvenile court's award of legal custody of a child absent an abuse of discretion. *In re C.B.*, 2d Dist. Montgomery No. 28113, 2019-Ohio-890, ___ N.E.3d ___, ¶ 17. The term "abuse of discretion" implies that the juvenile court's decision was unreasonable, arbitrary, or unconscionable. *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *AAAA Ents., Inc. v. River Place Community Urban*

---

[3] Although Aunt asserts that a stay was "granted by the trial court [on] September 5, 2018" (Appellant's Brief, p. 22), we see no indication in the record that the trial court ruled on Aunt's motion for a stay (Doc. #3) filed on that date.

*Redev. Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

   *b. Law Regarding Child Custody Decisions*

**{¶ 19}** R.C. 2151.23(A)(2) authorizes juvenile courts to make child custody determinations. Although R.C. 3109.04(D)(2) sets forth a "best interest of the child" standard to be applied by domestic relations courts making child custody determinations *in divorce proceedings between parents*, R.C. 2151.23(A)(2) does not specify the standard that juvenile courts are to use in custody determinations between a parent and a non-parent. *See In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 15. Addressing that omission, the Ohio Supreme Court has found:

> [T]he overriding principle in custody cases between a parent and nonparent is that natural parents have a fundamental liberty interest in the care, custody, and management of their children. This interest is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution[.] Since parents have constitutional custodial rights, any action by the state that affects this parental right, such as granting custody of a child to a nonparent, must be conducted pursuant to procedures that are fundamentally fair.

(Citations omitted.) *Id.* at ¶ 16.

**{¶ 20}** For that reason, in a child custody proceeding between a parent and a non-parent, a court may not award custody to the non-parent "without first determining that a preponderance of the evidence shows that the parent abandoned the child; that the parent contractually relinquished custody of the child; that the parent has become totally incapable of supporting or caring for the child; or that an award of custody to the parent

would be detrimental to the child." *In re Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1997), syllabus. Courts deciding a parent's "suitability" under the final prong of that analysis should focus on "the harmful effect of [parental] custody on the child, rather than [on] society's judgment of the parent." *Id.* at 98. "The appropriate analysis is whether the natural [parent] is unsuitable as custodian, not whether someone else is *more* suitable." (Citation omitted.) (Emphasis sic.) *In re D.C.J.*, 2012-Ohio-4154, 976 N.E.2d 931, ¶ 58 (8th Dist.).

{¶ 21} Since the *Perales* decision, courts of this state uniformly have recognized that a trial court may not award legal custody of a minor to someone other than a parent "[a]bsent a finding of parental unsuitability." *In re R.R.S.*, 2d Dist. Greene Nos. 2016-CA-25 and 2017-CA-45, 2018-Ohio-990, ¶ 17; *see also Hockstok* at syllabus ("In a child custody case * * * between a natural parent of the child and a nonparent, the trial court must make a parental unsuitability determination on the record before awarding legal custody of the child to the nonparent"); *Cantrell v. Trinkle*, 197 Ohio App.3d 82, 2011-Ohio-5288, 966 N.E.2d 288, ¶ 34 (2d Dist.) ("a parent may lose custody of a child to a nonparent [only] if a court finds the parent unsuitable").

{¶ 22} Once a legal custody determination has been made, however, "the best-interest-of-the-child standard should be used for any custody *modification* petitions filed * * *." (Emphasis added.) *Hockstok* at ¶ 38. The Court there continued:

> After * * * a determination has established * * * a parent's fundamental
> custodial rights, the focus must shift from the rights of the parents to the
> rights of the child. A child's rights are effectuated through the use of the
> *best-interest-of-the-child standard* for *subsequent* custodial modification

requests. In this way the rights of parents and children are balanced in child custody disputes.

(Emphasis added.) *Id.* at ¶ 38-39.

### c. Aunt's "Best Interest of Child" Argument

{¶ 23} In her first assignment of error, Aunt contends that the trial court erred by failing to find that R.D.B.'s "best interest" would be served by remaining in her custody. The trial court did make one brief reference in its final judgment entry to Father's having legal custody as being "in the best interest of the child." (*See* 8/14/18 Decision and Judgment, p. 5). As the case law outlined above makes clear, however, "the best interest of the child" is not the standard applicable to the custody contest between Aunt and Father, R.D.B.'s biological parent. Moreover, the analysis in which the trial court engaged in reaching its decision illustrates that the court properly applied the "unsuitable parent" standard set forth in *Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047 (*see* 8/14/18 Decision and Judgment, pp. 2-5), not R.C. 3109.04(D)(2)'s inapposite "best interest" standard, for which Aunt advocates.

{¶ 24} Because the trial court did not err by failing to base its custody determination on a "best interest of the child" analysis under the circumstances of this case, Aunt's first assignment of error is overruled.

### d. Aunt's "Unsuitable Parent" Argument

{¶ 25} Aunt's second assignment of error asserts that the trial court erred by failing to find Father to be an unsuitable parent and denying him custody of R.D.B. on that basis. Although this argument identifies the proper standard for the trial court's custody determination, the record does not support a conclusion that the trial court abused its

discretion by determining that Father had not been shown to be "unsuitable."

{¶ 26} "Nonparents seeking custody have the burden of demonstrating a parent's unsuitability." *In re J.R.*, 2d Dist. Montgomery No. 26894, 2016-Ohio-5054, ¶ 8, quoting *In re D.C.J.*, 2012-Ohio-4154, 976 N.E.2d 931, at ¶ 58. During the custody hearing, the evidence adduced by Aunt regarding Father's suitability as R.D.B.'s custodian consisted of testimony about one occasion when Father left R.D.B. at a barber shop where unnamed men "scared" R.D.B. by smoking what Aunt's counsel intimated was marijuana; Aunt's opinion that R.D.B. was too young to have been left alone at the barber shop; Aunt's expressed doubts about Father's "emotional closeness" to R.D.B. and Father's ability to support R.D.B.'s heightened emotional needs after Mother's death; testimony that Father once told R.D.B. to "knock it off" when R.D.B. persisted in wanting to return to Aunt's house; concerns about Father's availability in light of his third-shift work schedule; and suggestions that Father had not maintained a regular schedule of visits with R.D.B. or acted as legal custodian of any of Father's other children. We cannot conclude that the trial court abused its discretion by declining to find Father unsuitable based on that evidence.

{¶ 27} As to the barber shop incident, Father denied that the substance involved was marijuana, and Aunt presented no evidence to the contrary. Because the trial court, as the trier of fact, saw and heard the witnesses at the hearing, we defer to that court's decisions whether, and to what extent, to credit the testimony of particular witnesses. *Brown v. Grauman*, 2d Dist. Champaign No. 2013 CA 14, 2013-Ohio-4814, ¶ 9. Whether the trial court believed Father or simply concluded that the isolated barber shop incident

was not indicative of unsuitably, [4] the trial court acted within its discretion in its assessment of that evidence.

{¶ 28} Our deference also extends to all of the other testimony presented. The trial court had discretion to discount Aunt's expressed concerns about Father's briefly leaving a 10-year-old to be watched over by a barber that Father had known "for probably about 20 years," as well as her concerns about Father's ability to provide for R.D.B.'s emotional and spiritual needs. Father's work schedule was nearly identical to Aunt's, and Father expressed a willingness and ability to change his schedule if awarded custody. Father's alleged "knock it off" comment bears no indicia of inappropriate discipline, and nothing suggested that Father's occasional requests to vary from the parties' agreed visitation schedule were due to reasons other than the types of conflicts to be expected in any individual's schedule. The record evidence does not support a conclusion that the trial court abused its discretion in assessing Father's suitability to act as R.D.B.'s custodian.

{¶ 29} In reaching this conclusion, we recognize that Aunt's unsuitability argument on appeal focuses primarily on her contention that "Father has not visited nor communicated with [R.D.B.] since April 2017," including no money or gifts sent, no calls made, and no other form of contact initiated. (Appellant's Brief, pp. 2, 19, 21, 22). However, no evidence of that purported lack of contact appears in the record before us for purposes of this appeal. "[A] bedrock principle of appellate practice in Ohio is that an appeals court is limited to the record of the proceedings at trial." *Morgan v. Eads*, 104 Ohio St.3d 142, 2004-Ohio-6110, 818 N.E.2d 1154, ¶ 13, citing *State v. Ishmail*, 54 Ohio

---

[4] We have held that even a parent's own "occasional" use of marijuana did not necessitate a change in her custodial status. *See Gillum v. Gillum*, 2d Dist. Montgomery No. 24401, 2011-Ohio-2558, ¶ 15, 18.

St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus ("A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter."). For example, another Ohio appellate court has declined to consider "additional evidence" the appellants claimed "they would have introduced" before the juvenile court, stating that the appellate court's "scope of review must be limited to the transcript of the evidentiary hearing." *See In re M.L.E.*, 11th Dist. Portage Nos. 2015-P-0007, 2015-P-0010, 2015-Ohio-3647, ¶ 22.

{¶ 30} Significantly, a means by which the record might have been supplemented was available. "Juv.R. 40 contemplates that new events may arise or be discovered between the time of a magistrate's decision and a trial judge's final judgment, and the rule provides a mechanism for the introduction of such evidence in a timely manner." *In re A.S.*, 9th Dist. Summit No. 26462, 2013-Ohio-1975, ¶ 14, citing Juv.R. 40(D)(4)(b) and (d). In matters referred to magistrates, Juv.R. 40(D)(4) authorizes the juvenile court to "take additional evidence" after the magistrate has issued a decision. Further, Juv.R. 40(D)(4)(d) provides that, before ruling on objections to a magistrate's decision, the juvenile court may not refuse to hear additional evidence if "the objecting party demonstrates that the party could not, with reasonable diligence, have produced that evidence for consideration by the magistrate." *In re C.B.*, 2d Dist. Montgomery No. 23615, 2010-Ohio-2129, ¶ 25, quoting Juv.R. 40(D)(4)(d); *see also Robinson v. Beneta*, 2019-Ohio-667, ___ N.E.3d ___, ¶ 9 (3d Dist.) (when a party demonstrates he or she could not have produced additional evidence for magistrate's consideration, "the trial court must hold a hearing on the additional evidence").

{¶ 31} Where an objecting party fails to make a request pursuant to Juv.R.

40(D)(4)(d), however, a juvenile court "d[oes] not abuse its discretion by not reopening the matter to hear additional evidence." *In re K.P.*, 5th Dist. Fairfield Nos. 17-CA-3 and 17-CA-4, 2017-Ohio-4264, ¶ 23-24. It was incumbent on Aunt to make a request in accordance with Juv.R. 40(D)(4)(d) if she wished to preserve for appeal the issue of the evidence she faults the trial court for failing to consider. *Id.*; *see also, e.g., In re A.S.* at ¶ 25-27 (juvenile court erred by failing to consider appellant's proffer of additional evidence discovered after objections to magistrate's decision but before final judgment); *Robinson* at ¶ 9 (juvenile court erred by denying request for hearing on additional evidence). The record here contains nothing indicating that, between the date she filed her supplemental objections and the date the trial court ruled on those objections, Aunt asked to present to the trial court additional evidence about Father's conduct after the September 8, 2016 custody hearing.

{¶ 32} As we may not consider Father's purported actions subsequent to the September 8, 2016 custody hearing,[5] and as the trial court did not abuse its discretion in assessing the evidence presented at that hearing, Aunt's second assignment of error is overruled.

### Assignment of Error #3 – Manifest Weight of Evidence/Undue Delay

{¶ 33} Aunt's third assignment of error appears to advance two distinct bases for challenging the trial court's judgment: first, she argues that the trial court "failed to timely prepare [its final] decision," and second, she argues that the judgment "goes against the manifest weight of the evidence" showing that R.D.B.'s "best interest [would be] served"

---

[5] This conclusion does not affect any remedy that may be available through the trial court for Father's subsequent conduct. *See, e.g., In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 38-39.

in her custody. (Appellant's Brief, p. 22). Although Aunt combines those two arguments within a single assignment of error, we will address them separately.

*a. Manifest Weight of the Evidence regarding "Best Interest"*

**{¶ 34}** Aunt contends that the trial court's judgment was against the manifest weight of the evidence which, according to her, shows that R.D.B.'s "best interest" would be served by granting custody to Aunt, not Father. However, we have determined that the trial court did not apply, and should not have applied, the "best interest" test in making its custody determination. As such, we need not conduct a manifest weight analysis in order to conclude that Aunt's argument on the issue of R.D.B.'s "best interest" lacks merit. Her assignment of error on that basis is overruled.

*a. Undue Delay in Issuing Decision*

**{¶ 35}** In the other prong of her final assignment of error, Aunt in essence argues that the lapse of "nearly two years" between the custody hearing and the trial court's final judgment amounted to an abuse of discretion because the circumstances of Father's relationship with R.D.B. changed during that time. We do not agree.

**{¶ 36}** Where a trial court's judgment is not against the manifest weight of the evidence, a delay between the trial and the entry of judgment has been found not to affect the judgment, and thus not to amount to an abuse of discretion. *See Ross v. Sweeney*, 11th Dist. Portage No. 2002-P-0027, 2003-Ohio-2919, ¶ 21-23. A delay in filing a judgment entry also is not an abuse of discretion if the delay was attributable in part to the actions of the party challenging that delay and that party did not specify how he or she was prejudiced by the delay. *See Rice v. Rice*, 8th Dist. Cuyahoga No. 51025, 1986 WL 11525, *3 (Oct. 2, 1986).

{¶ 37} The record provides relevant context for the delay between the September 8, 2016 custody hearing and the court's August 14, 2018 final judgment entry. The magistrate issued his decision awarding custody to Father the day after the custody hearing, and the trial court adopted that decision the same day. Aunt filed timely objections to that decision and separately requested that the court issue findings of fact and conclusions of law. Her objections included requests for a transcript of the custody hearing as well as an extension of 21 days after the filing of that transcript in order to submit supplemental objections.

{¶ 38} In September 2016, the trial court granted Aunt's requests for findings of fact and conclusions of law, a transcript, and an extension to file supplemental objections. The court also ordered Aunt to submit proposed findings and conclusions within seven days. When Aunt moved for an extension to file the proposed findings of fact and conclusions of law, the court granted an additional seven days for that purpose. On September 23, 2016, Father responded to Aunt's objections. Aunt filed her proposed findings and conclusions a week later, on September 30, after which the magistrate issued findings of fact and conclusions of law on October 5.

{¶ 39} The hearing transcript was filed on December 22, 2016. On January 13, 2017, Aunt moved for another extension of time to file supplemental objections; the court granted an extension through January 25, 2017. Aunt filed her supplemental objections on that date. Father did not respond. The trial court entered its final judgment some 17 months later.

{¶ 40} Although the interval between the custody hearing and the final judgment entry was due in part to requests for extensions and other requests made by Aunt, the

record arguably reflects a substantial gap between the filing of the supplemental objections and the judgment. We therefore examine whether Aunt has demonstrated that she was prejudiced by the delay. *Ross*, 11th Dist. Portage No. 2002-P-0027, 2003-Ohio-2919, at ¶ 21-23; *Rice*, 8th Dist. Cuyahoga No. 51025, 1986 WL 11525, at *3.

{¶ 41} Aunt claims that she was prejudiced because "the trial court's decision came so late[ ] that none of the factors [regarding Father's conduct since the custody hearing] would be considered and could not be appealed * * *." However, had the decision been rendered sooner, evidence of Father's alleged post-hearing conduct *still* would not have been before the trial court – i.e., even if the trial court had ruled on Aunt's supplemental objections as soon as January 26, 2017, the day after Aunt filed them, the court's judgment presumably would have been no different. Aunt was not prejudiced because the trial court awarded custody of R.D.B. to Father a substantial time after the custody hearing instead of making the same determination much earlier. Indeed, it appears that R.D.B. has remained in Aunt's de facto custody throughout that time. Additionally, Aunt could have moved to submit additional evidence to the trial court pursuant to Juv.R. 40(D)(4)(d).

{¶ 42} Because Aunt has neither claimed nor demonstrated that the trial court's suitability determination was against the manifest weight of the evidence, and because she cannot demonstrate that she suffered any prejudice as a result of the timing of the final judgment, her third assignment of error is overruled.

### *Conclusion*

{¶ 43} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J., concur.


Copies sent to:

James R. Kirkland
Father
Hon. Anthony Capizzi