**[Cite as *Cantrell v. Trinkle*, 197 Ohio App.3d 82, 2011-Ohio-5288.]**

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

CANTRELL et al.,

      Appellee,

v.

TRINKLE,

      Appellant.

Appellate Case No. 2011-CA-17

Trial Court Case No. 08-JUV-400

(Civil Appeal from
 Common Pleas Court)

. . . . . . . . . . .

**O P I N I O N**

Rendered on the    14th    day of     October    , 2011.

. . . . . . . . . . .

James E. Heath, for appellees Randy and Tracy Wood.

Wilfred L. Potter, for appellant, Erica L. Trinkle.

Lawrence Hofbauer, Guardian ad litem.

. . . . . . . . . . . . .

FAIN, Judge.

{¶ 1}   Defendant-appellant Erica Trinkle appeals from a judgment of the Clark County Common Pleas Court, Juvenile Section, awarding custody of Trinkle's child to the child's paternal grandparents, Tracy and Randy Wood.  (Tracy Wood is the child's paternal grandmother, and Randy Wood is married to Tracy, making him the child's step-grandfather.)   Trinkle contends that the juvenile court's finding that she is an unsuitable parent is against the manifest weight of the evidence.   She further contends that the court denied her right to due process and that the trial court made several procedural errors.

{¶ 2}   We conclude that the juvenile court's finding that Trinkle is an unsuitable parent is against the manifest weight of the evidence.   When we weigh the evidence in this record, as permitted by App.R. 12(C), we conclude that Trinkle is not an unsuitable parent, and we accordingly reverse the judgment of the juvenile court.   Trinkle's claims of procedural errors and the denial of her due-process rights are thereby rendered moot.

I

{¶ 3}   Timothy Cantrell and Erica Trinkle were never married, but had a child, C.C., together on   September 21, 2007.   The couple lived with the child in a mobile home purchased by Cantrell's mother, Tracy Wood.

{¶ 4}   While the couple were still living together, in March 2008, the child was left with Trinkle's parents on one occasion while Trinkle was at work.   Trinkle's father took the child out in a vehicle and ran into a pole.   The child was in a safety seat and was not hurt.   It is suggested that   Trinkle's father was intoxicated at the time, but there is no proof of that fact in this record.

{¶ 5}   A referral was made to Clark County Children's Services ("CCCS"), which opened a case but filed no legal action.   In October 2008, Trinkle and Cantrell entered into a voluntary case plan with CCCS wherein they agreed to undergo mental-health assessments (along with any recommended follow-up counseling), complete parenting classes, complete the Help Me Grow program, and refrain from leaving the child alone with anyone who might be intoxicated by drugs or alcohol.   Neither Trinkle nor Cantrell complied with all of these requirements.   CCCS closed the case in December 2008.

{¶ 6}   During the intervention by CCCS, Trinkle and Cantrell ended their relationship in June 2008.   Thereafter, Trinkle and C.C. moved into the residence of Trinkle's aunt, Michelle Jacobs.

{¶ 7}   On June 27, 2008, Cantrell filed a complaint for custody of the child in the Juvenile Section of the Domestic Relations Division of the Clark County Common Pleas Court.   Cantrell alleged that Trinkle used illicit drugs, left the child with unsuitable persons, and failed to take the child to health appointments.   An ex parte order was entered granting temporary custody to Cantrell.   But this ex parte order was dissolved on July 16, 2008, following a review hearing, and custody was restored to Trinkle.

{¶ 8}   The custody matter was set for hearing.   In August 2008, Trinkle moved into subsidized housing with the child. In October 2008, Trinkle and Cantrell reconciled.   Cantrell moved back in with his parents, and Trinkle and the child would stay overnight with Cantrell on a somewhat regular basis.   On February 27, 2009, the parties entered into an agreed order that named Trinkle residential and custodial parent of the child.   Cantrell was given visitation rights. This order also required the parties to complete the voluntary case plan established by CCCS.   The order provided that "the parties shall utilize Randy and Tracy Wood, the minor child's paternal

grandparents for child care at times when both parents are working. In addition, at any time when the child is not in the care of the parents or Randy and/or Tracy Wood, the child is to be left in the care of a responsible party agreed upon by the parties."

{¶ 9} Trinkle and Cantrell separated again in April 2009, and Trinkle and the child lived in Trinkle's housing from April 2009 until September 3, 2010.

{¶ 10} On September 3, 2010, the Woods filed a motion seeking to join the juvenile court action as parties defendant. They also filed a motion for ex parte custody of the child, based upon an affidavit of Tracy Wood in which she averred as follows:

{¶ 11} "7. I fear for the safety of [C.C.]. [Cantrell and Trinkle have failed to complete] the Children's Services Case Plan and [Trinkle] continues to ignore the Court's order by leaving the child with people without [Cantrell's] agreement, including her father who was the cause of Timothy gaining temporary custody by ex-parte order in 2008.

{¶ 12} "8. I further fear for the safety of my grandson because [Trinkle] has failed to renew his Molina Healthcare and I believe she is using marijuana and partying when she should be caring for her child.

{¶ 13} "9. I further fear for the safety of my child [sic] because since this Court's last order of February 27, 2009, I have hearing [sic] [Trinkle] saying such things as, 'If I can't have him, nobody can have him, that she needs mental health treatment, that the child has ruined her life, and I will fight you to the death for [C.C.].'"

{¶ 14} The Woods also filed a motion seeking hair-follicle testing on both Cantrell and Trinkle. All these motions were granted on the same day they were filed, and the Woods took custody of the child. The hair-follicle testing results were returned to the court and were positive for Cantrell for cocaine, but negative for Trinkle. Trinkle opposed the change of custody.

{¶ 15} Hearings were conducted on December 15, 2010 and continued on January 24 and February 3, 9, and 11, 2011. During the hearings, the guardian ad litem appointed in the case recommended that temporary custody remain with the Woods for six months to permit Trinkle to demonstrate that she is "serious" about regaining custody. The GAL testified that while Trinkle had completed the mental-health assessment, she failed to attend mental-health counseling as recommended following her assessment.[1] The GAL testified that Trinkle needed to demonstrate that she is "serious" about parenting and that she can properly parent the child. The GAL stated that in order to convince him of her seriousness she needs to "get away from partying, settle down and build a home." The GAL noted that the only allegations he had regarding Trinkle's propensity for "partying" were made by Cantrell and the Woods. The GAL testified that he had not been able to verify the truth or falsity of those allegations.

{¶ 16} Cantrell also testified at the hearings on January 24, 2011. He testified that he thought Trinkle should have custody of the child so long as she takes him to his medical appointments and keeps medical insurance available for him. He admitted that he still has "feelings" for Trinkle. He further testified that he and Trinkle had used "illegal drugs" in the past, but did not specify a time frame except to say that he thought it was around the time the child was born. He then testified that the last time he had seen Trinkle use drugs was when they "first got together" as a couple. He also defined the "illegal drugs" as marijuana. Cantrell further testified

---

[1]There was evidence submitted, in the form of a letter, that as of September 27, 2010, Trinkle had completed a mental-health assessment. The letter states that Trinkle was seen for an assessment and that she reported that "she is having a custody dispute with the paternal grandmother of her son and is experiencing some anxiety." The letter gave a diagnosis of "Adjustment Disorder with Anxiety." The record before us does not contain any evidence that the person(s) who assessed Trinkle recommended follow-up counseling. While the trial court indicates that the GAL report contains a reference to a recommendation for follow-up counseling, that report was not made a part of the record. Nor does the assessment letter contain such a recommendation. Finally, the testimony of the GAL indicates that he talked to a "counselor who recommended counseling"; however, his testimony provides no further information regarding this issue.

that he spent three nights with Trinkle between December 15, 2010, and January 24, 2011, and that they "went to a pool hall a couple times." He testified that during that time period they drank alcohol, but did not use illegal drugs.

{¶ 17} Randy Wood testified that he is concerned that Trinkle cannot care for the child. Specifically, he testified that both Cantrell and Trinkle told him they had a problem with illegal drug usage. Wood made reference to both Cantrell and Trinkle taking Percocet, while Cantrell also used cocaine and Trinkle also used marijuana. Randy Wood testified that they talked about this usage some time after the child was born, but his testimony is not clear as to whether they talked about past usage or whether they were using the drugs at the time of the conversation.

{¶ 18} Mr. Wood also testified that in July 2010, Trinkle left the child with her parents after the entry of the February 2009 agreed order that contained a requirement that she not leave the child with her parents.[2] He testified that he and his wife sat parked in their vehicle "two blocks away" from Trinkle's parents that night, beginning at 7 or 8 p.m. when they observed Trinkle and the child enter the parents' home. Wood testified that

> Trinkle left the home at 11 p.m. and did not return until 3 a.m. Wood testified that he and his wife sat in their vehicle and watched the home that entire time. Wood also testified that there were "several, at least three times" that he and his wife were "concerned" that Trinkle left the child at her parents' home. He testified that they did numerous drive-by checks of Trinkle's parents' home, but he did not claim that they saw Trinkle leave the child there other than the one night.

{¶ 19} Wood testified that he has other concerns for the child. Specifically, he stated that "I don't feel that as a young mother, that [Trinkle] would keep up with his doctor visits, the

---

[2]There is no such requirement in the 2009 agreed order.

insurance, his health insurance. * * * I don't feel he's getting the proper attention and care that he would need, devoting attention just to [the child] rather than running him around socializing from one different place to another, or dropping him off leaving him with someone else.   And not, just the teachings of things, that he comes back and he's learned how to dance and shake his booty and the things that he learns when he comes back, I don't feel that he's gaining anything from it."

{¶ 20}  Tracy Wood testified that after C.C. was born and the couple moved into the mobile home with the child, they began "fighting, arguing, [and] partying, had several complaints from the park manager about it, and to the point that they were getting ready to evict them, which is also things that I experienced in my home prior to them moving to the mobile home."   When asked to define "partying," Wood testified it meant "loud music, alcohol, marijuana, possibly other things. Can't be specific."

{¶ 21}  She testified that neither Trinkle or Cantrell did drugs or drank while living at her home.   She further testified that on one occasion while they lived in the mobile home, she had seen empty liquor bottles lined up on the refrigerator and in a cabinet.   She testified that she saw "vodka and Jagermeister bottles," but that she is not familiar with liquor.   She also testified that beer bottles looked like liquor bottles to her.

{¶ 22}  When asked why she thought Trinkle used marijuana while she lived in the mobile home, Tracy Wood testified, "well, I can't pinpoint if it was [Cantrell] or [Trinkle] or both, the evidence was there that was there."   But Wood admitted that she did not know whether Trinkle was using marijuana and that she never saw her drinking or smoking marijuana.   Wood testified that when the couple reconciled in October 2008, they would leave the child with the Woods on the weekends and spend the weekends "partying."

{¶ 23}  Wood  testified  that  Trinkle  admitting  to  smoking  marijuana  and  to  taking  a

Percocet when "her cramps were bad or she could not sleep." However, other than stating that at Thanksgiving in 2009 she thought the child smelled of marijuana, Wood was not able to give any specific time frames. Wood testified that Trinkle denied partying.

{¶ 24} Wood testified that she thought Trinkle would drink and drive with the child in the car. Wood was asked whether she had ever observed Trinkle drink and then put the child in the car and drive anywhere. In response, Wood testified that "several times" Trinkle had called her from a restaurant to arrange for Wood to come get the child because Trinkle was having dinner and drinks and wanted to remain with her friends. She also stated that she had no evidence that Trinkle would drink and drive with the child other than "just real good, strong suspicion."

{¶ 25} Wood testified that "one night" she and her husband stopped by Trinkle's residence and saw open liquor bottles on the couch. She said that Trinkle told them that she had tried to call them to come get the child and watch him. Wood also testified that "from time to time" they would see the child at Trinkle's parents' home "with or without" Trinkle's car being there or would see both Trinkle and the child there. However, other than the July 2010 incident recited above by Randy Wood, neither of the Woods testified to any specific time reference or any specific allegations that the child was left there without Trinkle.

{¶ 26} Tracy Wood also testified that "one night in 2010" her phone rang at 11:45 p.m. and that she "called [Trinkle] back when we got home because her cell phone was on my caller ID and she told me that [C.C.] accidentally hit our number on her phone and he was playing with the phone and she told me she was at her friend's house in South Charleston and she was not. And we had been at her house and she got in her car and left after she left [C.C.] in the car and went in and grabbed something and left." She testified that this concerned her because she did not think the child should be "drug all around from place to place to place that she choses [sic] to run to. And I

don't feel that drinking and partying and driving a vehicle is a safe condition for a child."

**{¶ 27}** Tracy Wood also testified that she believes that Trinkle needs mental-health counseling because Trinkle had said things to her such as, "if I can't have him nobody can; I will fight to the death for my child; and, this child will ruin my life." Wood also testified that on two occasions, Trinkle admitted that she needed mental-health counseling.

**{¶ 28}** Finally, Wood testified that C.C. is doing well in her custody and that he is "not as temperamental as he was, meaning he doesn't act as agitated as he would, when he came back to me from his mother."

**{¶ 29}** Following the hearing, the juvenile court awarded custody to the Woods on the basis that Trinkle is an unsuitable parent, because awarding custody to her would be detrimental to the child. The court stated that Trinkle "currently exhibit[s] a total inability to provide adequate care or support for the minor child herein and it is reasonable to believe that [she] will not be able to provide such adequate care or support in the indefinite future."

**{¶ 30}** The judgment was centered upon findings that Trinkle is a 22-year-old who (1) lives in subsidized housing, (2) works 40 hours per week from six a.m. until two p.m., makes $20,363 per year, and lacks health insurance, (3) has a suspended operator's license due to a lack of insurance and a prior accident, (4) does not have "much of a support system," (5) smoked marijuana at the beginning of 2010, (6) let the child's health-insurance card lapse, (7) did not comply with the case plan until shortly before trial, (8) spends considerable time "partying with friends and prioritizing her social life over that which was in C.C.'s best interest," and (9) left the child in the care of unsuitable persons.

**{¶ 31}** From the judgment awarding custody to the Woods, Trinkle appeals.

II

**{¶ 32}** Trinkle's fourth assignment of error states as follows:

**{¶ 33}** "The decision of the trial court was an abuse of discretion and against the manifest weight of the evidence."

**{¶ 34}** A parent's right to raise a child is an essential and basic civil right. *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680. However, a parent may lose custody of a child to a nonparent if a court finds the parent unsuitable. *In re Perales* (1977), 52 Ohio St.2d 89, 369 N.E.2d 1047, syllabus. Thus, in child custody proceedings under R.C. 2151.23(A)(2) between a parent and nonparent, a court may not award custody to the nonparent "without first determining that a preponderance of the evidence shows that the parent abandoned the child; contractually relinquished custody of the child; that the parent has become totally incapable of supporting or caring for the child; or that an award of custody to the parent would be detrimental to the child." *Perales* at syllabus.

**{¶ 35}** The standard of review we apply to a trial court's decision concerning child custody is abuse of discretion. *Musgrove v. Musgrove*, Montgomery App. No. 24640, 2011-Ohio-4460, 2011 WL 3890305, ¶ 7. The term "abuse of discretion" is defined as "an attitude that is unreasonable, arbitrary or unconscionable." *Id.* "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* "It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *AAAA Ents., Inc. v. River Place Community Urban Redev. Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597.

**{¶ 36}** A "preponderance of the evidence" is "evidence which is of greater weight or more

convincing than the evidence which is offered in opposition to it." Black's Law Dictionary (6th Ed.1998) 1182. In reviewing a manifest-weight challenge, this court will not reverse a judgment that is supported by some competent, credible evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E2d 578. Furthermore, we are guided by the presumption that the findings of the trial court are correct, since the trial court is best able to view the witnesses and observe their demeanor, gestures, and voice reflections and use these observations in weighing the credibility of the testimony. *In re Jane Doe* (1991), 57 Ohio St.3d 135, 138, 566 N.E.2d 1181.

{¶ 37} According to the testimony of the Woods, they believed that Trinkle should not have custody because she was not able to properly care for the child, she used drugs and drank, she would drink and drive, and she left the child with her parents, who were unsuitable.

{¶ 38} With regard to leaving the child with unsuitable persons, the Woods were able to testify that one time during the summer of 2010, it appeared that Trinkle had left the child playing at Trinkle's parents' home. While it does appear from the record that Cantrell and the Woods believed Trinkle's parents to be unsuitable caregivers, there is nothing in the record to establish that Trinkle was prohibited from leaving the child with her parents so long as she had Cantrell's agreement to do so. And the record supports a finding that many times Trinkle was not able to contact Cantrell because he did not have a phone. In any event, the Woods' own testimony demonstrates that a third adult was present the entire time C.C. was at his maternal grandparents' home.

{¶ 39} With regard to the allegations of partying, the evidence establishes that Trinkle had smoked marijuana. Indeed, Trinkle admitted during her testimony that she had smoked marijuana in the past. She also admitted that she had smoked it at a friend's home sometime in early 2010, while the child was with the Woods for visitation with Cantrell. Trinkle admitted that she does go

out with friends and that she does drink alcohol. However, she denied abusing alcohol or marijuana, and she denied driving while intoxicated.

**{¶ 40}** The Woods testified that while Trinkle was living with Cantrell in the mobile home, the Woods observed some empty liquor bottles. When Trinkle was living in her subsidized housing, the Woods observed a liquor bottle in her apartment. At no point did the Woods testify that they had ever observed Trinkle smoke marijuana or drink alcohol. Neither did they testify that they ever observed her under the influence of alcohol or drugs when the child was in her care or even when the child was not in her care. The evidence establishes, at most, that Trinkle drank alcohol on occasion and smoked marijuana once since the child's birth.

**{¶ 41}** But there is no evidence that Trinkle drank alcohol or smoked marijuana when the child was in her care. Instead, it shows that when she was at dinner with friends, she called the Woods because she wanted to have a drink with friends, and she asked the Woods to watch the child. Also, the evidence shows that there were occasions during the three years of the child's life when Trinkle had the child but would leave him with the Woods in order to go out with friends. While the Woods seem to be claiming that Trinkle was constantly leaving the child with them in order to socialize with friends, they provided no testimony concerning the frequency of these occurrences. Indeed, it appears that many of the times that Trinkle left the child with them was during the period when she and Cantrell had reconciled and would go out together, leaving the child with the grandparents during the weekend.

**{¶ 42}** The trial court stated that Trinkle is young, works 8 hours per day, and lives in subsidized housing. This finding does nothing to establish a detrimental effect upon the child. If the fact of being younger was enough to establish detriment, many young women would automatically be deemed unsuitable. Other than unsubstantiated, vague allegations by Randy and

Tracy Wood that Trinkle does not know how to take care of a child, there is nothing in this record to demonstrate her inability to care for the child. Additionally, there are no allegations that Trinkle's housing is substandard or that the living conditions in the house are unsanitary.

{¶ 43} Nor can we say that being a working mother is a basis for a finding of detriment. It is clear that Trinkle had care providers for the child. The Woods had expressed the willingness, and even demanded, to watch the child while she worked. Additionally, she has two aunts who had watched the child for her in the past and who have expressed future willingness to help. If holding a full-time job were a basis for finding detriment, the Woods would be deemed unsuitable: they both work and currently leave the child with a separate caregiver during the day.

{¶ 44} There is nothing in the record to indicate that the child experienced any detriment during the one-month period that his health insurance lapsed. The evidence shows that as soon as Trinkle was aware of the lapse, she immediately rectified the matter and coverage was resumed.

{¶ 45} We disagree with the finding that Trinkle does not have "much of a support system." The record does not support this finding. Trinkle has two aunts who have provided her with help and have expressed a willingness to continue to provide support. Furthermore, by their own testimony, the Woods have willingly, and even forcefully, played a support role.

{¶ 46} There is nothing in the record to indicate that Trinkle's lack of an operator's license has a detrimental effect upon the child. Many people lack a license, or a car to drive, and are still able to find transportation. There is nothing in this record to support a finding that Trinkle is unable to provide some form of transportation for the child when he needs to be taken anywhere.

{¶ 47} Finally, the use of alcohol and the recreational use of marijuana, outside the presence of the child, without more, do not establish detriment. See, e.g., *Gillum v. Gillum*, Montgomery App. No. 24401, 2011-Ohio-2558, 2001 WL 2084148. While there is evidence in

this record that Trinkle has used alcohol and marijuana in the past, there is nothing to indicate that she abuses alcohol or that she has used either substance when taking care of the child. To the contrary, the evidence establishes that when Trinkle has "partied," she has called the Woods or another adult to watch the child. While we do not condone the use of marijuana, this record does not establish that Trinkle's use of the substance has been detrimental to the child.

{¶ 48} The evidence does show that at the time of the hearings, Trinkle was a young mother of 22 who had worked a full-time job for two years while caring for a small child without the help of the child's father. After being asked to leave the Woods' mobile home, Trinkle lived with an aunt for a couple of months before establishing her own residence. During the time the child was in her custody, Trinkle maintained health insurance for the child except for a one-month lapse in coverage that she quickly rectified. There is no evidence in the record that she failed to take the child to his medical appointments. In short, other than generalized, vague allegations regarding the temperament of a three-year-old, none of the testimony presented by the Woods establishes that the child was not properly taken care of or that Trinkle was an unsuitable mother.

{¶ 49} We conclude that the record before us fails to demonstrate that permitting Trinkle to retain custody of her child will result in detriment to the child. Thus, we conclude that the finding that Trinkle is an unsuitable parent is without adequate foundation in the record and is against the manifest weight of the evidence.

{¶ 50} Under App.R. 12(C), we are permitted in a civil action tried to the trial court without a jury, having found the judgment to be against the manifest weight of the evidence, to reverse the judgment "and either weigh the evidence in the record and render the judgment or final order that the trial court should have rendered on that evidence or remand the case to the trial court for further proceedings." Because we find the evidence in this record to preponderate clearly

against a finding that Trinkle is an unsuitable parent, we choose to reverse the judgment of the trial court and render the judgment that the trial court should have rendered on that evidence, restoring Trinkle as the legal custodian and residential parent of the child.

{¶ 51} Trinkle's fourth assignment of error is sustained.

### III

{¶ 52} Trinkle's first, second and third assignments of error provide as follows:

{¶ 53} "The trial court erred as a matter of law by issuing an ex parte order of custody without the existence of an emergency; without a proper R.C. 3127.23 jurisdictional affidavit; without the filing of a complaint; and for failing to immediately have a probable cause hearing on the ex parte order.

{¶ 54} "The trial court deprived appellant of due process of law by first the issuing of an ex parte order of custody then failing to review the order of custody timely.

{¶ 55} "The trial court erred as a matter of law by allowing a stepfather [sic] of the child to be added as a party and then awarding him custody."

{¶ 56} Trinkle contends that the juvenile court erred with regard to procedural matters and issues of due process. Given our disposition of the fourth assignment of error set forth in Part II above, these arguments have been rendered moot.

{¶ 57} Trinkle's first, second and third assignments of error are overruled as moot.

### IV

{¶ 58} Trinkle's fourth assignment of error being sustained, the judgment of the juvenile court is reversed. Trinkle is restored to her previous status as the legal and residential custodian of the minor child, C.C. The child shall be returned to Trinkle in accordance with our judgment herein. This cause is remanded to the trial court for the purpose of carrying this judgment into

execution.

Judgment accordingly.

GRADY, P.J., and FROELICH, J., concur.

FROELICH, Judge, concurring.

{¶ 59} I write separately only to express concern over the procedures, as far as they are reflected in the record, that occurred - or did not occur - in this case.

{¶ 60} On September 3, 2010, the grandparents filed a "motion" that asked the court for "an order naming the residentials parent and custodians of the minor child * * * in the best interest of that child and to provide security for that child [sic]." At the same time they filed a "motion for ex parte orders" requesting "an immediate order naming the temporary residential parents and custodians of the minor child * * * in the child's best interest and to provide security for the child and for the reasons set out in Affidavit of Tracy Wood attached hereto [sic]."

{¶ 61} There are two affidavits of Tracy Wood attached. The "Affidavit of Child Custody Pursuant to Section 3109.27 ORC" says that it is in accordance with R.C. 3109.27 and Civ.R. 75(M) and details the names and addresses of the people involved with the care of her grandchild and certain dates and locations of that care. Interestingly, this list includes where the "child has lived * * * within the last five years" despite the fact that the child was not even three yet. There is no allegation of current or potential abuse or neglect. R.C. 3109.27 does not exist. It was formerly part of the Uniform Child Custody Jurisdiction Law and was repealed in 2005. Civ.R. 75(M) is captioned "Testimony" and has no apparent relevance to the affidavit or the motions.

{¶ 62} The other "Affidavit of Tracy Wood" states that she fears for her grandson's safety because the child's biological parents did not complete the CSB care plan, the mother leaves the

child with people without the father's agreement, the mother did not renew health insurance, she believes her daughter-in-law is "using marijuana and partying when she should be caring for her child," and has made statements in the last one and a half years such as she needs mental health treatment and "I will fight you to the death for [my child]." In an "Ex-Parte Entry" prepared by movant's counsel and filed simultaneously with the motions, the court found the motion "well taken" and set a "review hearing" for September 20.

{¶ 63} On this record, there was no authority for the court's ex parte order depriving a biological and legal parent of custody. Moreover, when ex parte emergency orders are permitted, an immediate hearing is mandatory as a matter of Ohio law, let alone due process. See, e.g., Juv.R. 13(B)(3) and R.C. 2151.33(D).