[Cite as *In re S.R.*, 2026-Ohio-2427.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY

IN THE MATTER OF: S.R.

:

:  C.A. No. 2025-CA-20

:

:  Trial Court Case No. 2024 JG 06

:

:  (Appeal from Common Pleas Court-
:  Juvenile Division)

:

:  **FINAL JUDGMENT ENTRY &**
:  **OPINION**

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on June 26, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
ROBERT G. HANSEMAN, JUDGE

TUCKER, J., and EPLEY, J., concur.

AARON D. LOWE, Attorney for Appellant
CATHY J. WEITHMAN, Attorney for Appellees

HANSEMAN, J.

{¶ 1} Appellant, Father, appeals from the judgment of the Juvenile Division of the Champaign County Common Pleas Court that granted appellees, Maternal Grandfather and Maternal Grandfather's wife, D.N., legal custody of Father's minor son, S.R. For the reasons outlined below, the judgment of the trial court is affirmed.

**Facts and Course of Proceedings**

{¶ 2} Mother and Father are the biological parents of five-year-old S.R. There is no dispute that Father met Mother while she was a resident at a Christian ministry drug rehabilitation facility for women called New Beginnings. While in New Beginnings, Mother worked at a McDonald's restaurant that Father frequented when he was on the road working as a truck driver. Father visited Mother at McDonalds for six months, and he then took a drug test and received permission from New Beginnings to take Mother out on dates and to his home in North Carolina. During that time, Father was in his 50s with four adult biological children and two adult stepchildren, and Mother was in her 20s with four minor children. Mother's then-seven-year-old daughter, A.N., was the only child in her custody at the time.

{¶ 3} Around 2017 or 2018, Mother and A.N. moved into Father's home in North Carolina. Mother thereafter became pregnant with S.R., who was born in 2020. When S.R. was five months old, Mother left Father and took the children with her to Ohio without notice. Mother left Father owing to alleged emotional and physical abuse. Mother was pregnant with her sixth child, S.N., when she left Father.

**{¶ 4}** After leaving Father, Mother continued to struggle with drug addiction and went to her mother, Maternal Grandmother, for help. As a result of Mother relapsing, Maternal Grandmother took A.N. and S.R. into her care and placed S.N. with Mother's sister. Shortly after taking the children, Maternal Grandmother asked Maternal Grandfather and his wife, D.N., if they would be willing to take in S.R. They agreed, and Maternal Grandfather and D.N. began caring for S.R. just before he turned two years old in August 2022. S.R. has been in Maternal Grandfather and D.N.'s care ever since.

**{¶ 5}** On February 5, 2024, Maternal Grandfather and D.N. filed a complaint for legal custody of S.R. in Champaign County. After receiving notice of the complaint, Father filed a motion for legal custody of S.R. and for a determination of paternity. In response to Father's motion, genetic testing was performed, and it was confirmed that Father was S.R.'s biological father. The trial court thereafter scheduled an evidentiary hearing on the legal custody matter.

**{¶ 6}** On February 5, 2025, Mother, who was incarcerated in a community-based corrections facility called the STAR program, appeared at the evidentiary hearing via the video-conferencing platform Zoom. The purpose of Mother's appearance was not for her to formally testify but to state her position on the legal custody matter. Mother told the trial court that she was in favor of the trial court granting legal custody of S.R. to Maternal Grandfather and D.N. and that she was opposed to Father having legal custody or any contact with S.R. Mother stated that she did not want Father to have contact with S.R. because Father had physically abused A.N. Mother also told the trial court that she and Father had fought for custody of S.R. in Catawba County, North Carolina. According to Mother, Father did not get custody of S.R. because he had lied to the court about some of his background information.

3

Mother also claimed that she had obtained a civil protection order ("CPO") against Father in Ohio.

{¶ 7} After Mother referenced the North Carolina custody action and the Ohio CPO, the trial court asked counsel for both parties whether they believed it was important for the trial court to attempt to find the court documents relating to those matters. In response, both parties agreed that it was important to find the court documents in question and did not object to the trial court taking a recess for that purpose.

{¶ 8} Following a recess, the trial court advised the parties that it was able to find a final order dismissing the custody action filed by Father against Mother in Catawba County, North Carolina. The trial court explained that the order in question indicated that Father had filed a verified complaint on January 8, 2021, in which Father had "made a variety of false statements which he knew or should have known to be false in violation of Rule 11 of the North Carolina Rules of Procedure." Feb. 5, 2025 Hearing Tr. 14. The order also indicated that one of the false allegations made by Father in the complaint was that he was "retired with the rank of first sergeant from the US Marine Corp in 2009, after 20 years of service . . . [, and had] two associate's degrees, one from Georgia Tech in electrical engineering and one from Florida State in history and computer science." *Id*. The order further indicated that, as a result of Father's failure to produce any documentary proof of the aforementioned allegations, the court in North Carolina dismissed Father's action.

{¶ 9} As for the Ohio CPO, the trial court advised the parties that it had found a consent agreement and CPO that had been signed and filed by Mother and Father on June 29, 2022, that protected Mother and A.N. from Father. The trial court indicated that the CPO expired on April 22, 2023.

4

{¶ 10} After the trial court reviewed with the parties the final dismissal order from North Carolina and the Ohio consent agreement and CPO, it asked whether the parties had any objection to the court considering those court documents as exhibits in the legal custody matter. Neither party objected, and the trial court admitted the court documents into evidence as Court's Exhibits 1 and 2.

{¶ 11} Although the trial court indicated that it did not typically permit parties to give testimony over Zoom, the trial court allowed Mother to testify at the evidentiary hearing to learn more about her allegation of Father physically abusing A.N. After Mother gave her testimony on that matter, the trial court continued the evidentiary hearing to May 8, 2025. On that date, the trial court heard testimony from Maternal Grandfather, D.N., Father, and the guardian ad litem ("GAL") that was appointed for S.R.

{¶ 12} During the evidentiary hearing, the trial court admitted three GAL reports into evidence. The first GAL report included no substantive information or recommendation because the GAL had not yet met with any of the parties when the report was due. The second GAL report provided a thorough discussion of the GAL's investigation, which included meetings with Father, Maternal Grandfather, D.N., and S.R. It also included the GAL's observations of a Zoom and in-person visit between Father and S.R. In the second report, the GAL recommended that it would be in S.R.'s best interest for Maternal Grandfather and D.N. to be granted legal custody of S.R. and for Father to have some parenting time as well.

{¶ 13} The third GAL report was filed after the GAL had a chance to speak with Mother and A.N. about Father's alleged abuse. After considering those conversations and reviewing photographs attached to Mother's CPO petition that depicted injuries on A.N.'s body that were consistent with the physical abuse alleged by A.N., the GAL changed her

5

recommendation to Father only having supervised visitation with S.R. The GAL's recommendation for Maternal Grandfather and D.N. to receive legal custody of S.R. did not change.

{¶ 14} In addition to the GAL reports, the trial court admitted three spiral notebooks into evidence that the GAL had received from Maternal Grandmother. The GAL advised that the notebooks had belonged to A.N. The contents of the notebooks evidenced "writing punishments" that Father allegedly gave A.N. while she was living with him in North Carolina.

{¶ 15} After considering the testimony and evidence presented at the evidentiary hearings, the trial court issued a decision on June 12, 2025, finding that legal custody in favor of either Mother or Father would be detrimental to S.R. because both Mother and Father were unsuitable custodians. The trial court found that Mother was unsuitable because she was currently incarcerated, had an ongoing substance abuse issue, and had acknowledged that she was not in a position to take custody of S.R. The trial court found that Father was unsuitable based on his abuse of A.N. The trial court noted that Father lacked any credibility, and that his lack of credibility, along with the CPO, lended credence to the evidence indicating that he was physically and emotionally abusive.

{¶ 16} The trial court further found that it was in S.R.'s best interest to grant legal custody to Maternal Grandfather and D.N. In reaching that conclusion, the trial court referenced the GAL's recommendation. The trial court also explained that S.R. had seen Father in person only once since he was five months old and that it was unclear whether there was any bond between Father and S.R. In contrast, the trial court found that S.R. was strongly bonded to Maternal Grandfather and D.N., who had been caring for him for over two years. The trial court also found that Maternal Grandfather and D.N. had provided a safe home for S.R., had met all of S.R.'s needs, and had allowed S.R. to maintain relationships

6

with A.N. and S.N. The trial court further found that Maternal Grandfather and D.N. had permitted Father to engage in regular Zoom visits with S.R., even without a court order. As a result of these findings, the trial court granted Maternal Grandfather and D.N. legal custody of S.R. and ordered Father and Mother to receive only supervised parenting time as agreed by Maternal Grandfather and D.N.

{¶ 17} Father now appeals from the trial court's legal custody order and raises four assignments of error for review.

### First Assignment of Error

{¶ 18} Under his first assignment of error, Father claims that the trial court erred by admitting the GAL reports and the GAL's testimony at the evidentiary hearing on grounds that the GAL was biased and failed to comply with standards articulated in Sup.R. 48. We disagree.

{¶ 19} With regard to the GAL reports, we note that Father's trial counsel confirmed on the record that Father wanted those reports to be admitted into evidence and stipulated to their admission during the final evidentiary hearing. May 8, 2025 Hearing Tr. 5. "A stipulation to the admissibility of evidence precludes any subsequent challenge or claim of error relating to the stipulated evidence." *In re T.G.*, 2022-Ohio-1213, ¶ 76 (5th Dist.), citing *Lentz v. Schnippel*, 71 Ohio App.3d 206, 211 (3d Dist. 1991). Because Father stipulated to the admission of the GAL reports, he is precluded from challenging their admission on appeal.

{¶ 20} As for the GAL's testimony, during the evidentiary hearing, Father never specifically objected to that testimony on grounds of bias or any alleged failure to comply with Sup.R. 48. Accordingly, Father has waived all but plain error for appeal on those issues.

**{¶ 21}** "'The plain error doctrine permits correction of judicial proceedings when error is clearly apparent on the face of the record and is prejudicial to the appellant.'" *Schutz v. Schutz*, 2017-Ohio-695, ¶ 44 (2d Dist.), quoting *Reichert v. Ingersoll*, 18 Ohio St.3d 220, 223 (1985). "'In civil cases, the plain error doctrine is not favored and may only be applied in the extremely rare case involving exceptional circumstances such that the error, if left uncorrected, would challenge the fairness, integrity, or public reputation of the judicial process itself.'" *In re D.E.*, 2021-Ohio-524, ¶ 76 (10th Dist.), quoting *Brisco v. U.S. Restoration & Remodeling, Inc.*, 2019-Ohio-5318, ¶ 25 (10th Dist.). The use of this doctrine "is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Reichert* at 223, citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

**{¶ 22}** Father claims that the GAL's testimony should not have been considered in the legal custody matter because the GAL failed to comply with the following requirements under Sup.R. 48.03:

**(A) General Responsibilities.**

The responsibilities of a guardian ad litem shall include, but are not limited to, the following:

. . .

(2) Maintain independence, objectivity, and fairness, as well as the appearance of fairness, in dealings with parties and professionals, both in and out of the courtroom[.]

. . .

**(D) Duties of the Guardian Ad Litem.**

8

Unless specifically relieved by the court, the duties of a guardian ad litem shall include, but are not limited to, the following:

. . .

(6) Interview the parties, foster parents, guardians, physical custodian, and other significant individuals who may have relevant knowledge regarding the issues of the case. . . .

(7) Interview relevant school personnel, medical and mental health providers, child protective services workers, and court personnel and obtain copies of relevant records;

. . .

(9) Obtain and review relevant criminal, civil, educational, mental health, medical, and administrative records pertaining to the child and, if appropriate, the family of the child or other parties in the case;

. . .

(11) Review any necessary information and interview other persons as necessary to make an informed recommendation regarding the best interest of the child.

{¶ 23} Before addressing Father's specific claims, we note that "[t]he Supreme Court of Ohio . . . adopted Sup.R. 48 to govern guardian ad litem standards in Ohio and has indicated that this is the first rule that sets statewide standards regarding the appointment, responsibilities, training and reporting requirements of guardians ad litem." *In re K.G.*, 2010-Ohio-4399, ¶ 10 (9th Dist.). "'Ohio appellate courts have indicated that the Rules of Superintendence are general guidelines for the conduct of the courts and do not create substantive rights in individuals or procedural law.'" *Corey v. Corey*, 2014-Ohio-3258, ¶ 9

(2d Dist.), quoting *Nolan v. Nolan*, 2012-Ohio-3736, ¶ 26 (4th Dist.). Therefore, "'Sup.R. 48 does not have the force of law.'" *Id.*, quoting *Nolan* at ¶ 26. "Rather, [Sup.R. 48], like all Superintendence Rules, is an administrative directive." *Id.*, citing *Pettit v. Pettit*, 2012-Ohio-1801, ¶ 12 (12th Dist.). "Because Sup.R. 48 is a general guideline that lacks the force of statutory law, noncompliance with Sup.R. 48(D) is not grounds for the automatic exclusion of a guardian ad litem's report, testimony, or recommendation." *In re R.P.*, 2021-Ohio-4065, ¶ 31 (10th Dist.), citing *In the Matter of K.W.*, 2018-Ohio-1933, ¶ 100 (4th Dist.). "Rather, the trial court may exercise its discretion to consider that evidence." *Id.*, citing *Corey* at ¶ 9. (Other citations omitted.) "As the trier of fact, the trial court may take into account any deficiencies in the guardian ad litem's performance when assigning weight to the guardian's testimony and opinions." *Id.*

{¶ 24} In this case, Father claims that the requirements under Sup.R. 48.03 were not satisfied because the GAL spoke with only witnesses that favored Maternal Grandfather and D.N. as to the allegations of abuse. Specifically, Father claims that the GAL spoke with only Mother, A.N., and Maternal Grandmother. Because of this, Father argues that it was apparent the GAL did not maintain objectivity and fairness in conducting her investigation and improperly acted as an advocate for Maternal Grandfather and D.N.

{¶ 25} In support of this claim, Father points to the fact that the GAL did not contact A.N.'s school in North Carolina or obtain any relevant records from that school to determine whether there were any signs of abuse while A.N. was living with Father. This claim lacks merit. As the GAL explained at the evidentiary hearing, she did not contact A.N.'s school or request any school records because she is not A.N.'s GAL and thus lacked the authority to do so.

**{¶ 26}** Father also points to the fact that the GAL did not contact his neighbors in North Carolina. The GAL, however, testified that she did not reach out to Father's neighbors because Father never told her that they were witnesses to what was going on in his household. The GAL explained that Father had provided her with the names of neighbors for the purpose of identifying individuals who could potentially babysit S.R. if he were placed in Father's care. The GAL was not aware that the neighbors had any information that was pertinent to the allegations of abuse.

**{¶ 27}** Father further claims that the GAL should have contacted him after learning about the alleged abuse so that she could hear his side of the story. To clarify, the GAL did contact and speak with Father during her investigation. Father simply takes issue with the fact that the GAL did not contact him after she spoke with Mother and A.N. about his alleged abuse. Under the circumstances of this case, however, we cannot fault the GAL for not conducting a supplemental interview of Father. This is because Father lied to the GAL on several occasions. The GAL explained:

Father has continued to perpetrate falsehoods and dishonest statements in the instant case, as he has in prior cases. Father alleged that Mother sought a CPO but that the CPO was dismissed against him. This was wholly false, with Father signing a consent agreement protecting Mother and her minor daughter [A.N.]. Father alleged to undersigned that he obtained an emergency custody order for [S.R.] from North Carolina but that he "dismissed his action to maintain [S.R.] in Ohio because Mother never showed up to any of the hearings." This also was proven to be a complete falsehood, with records from the Court indicating Mother not only appeared but also had retained counsel, and that the case was dismissed

11

not at Father's request but because he filed a verified complaint which he lied in.

Additionally undersigned asked Father regarding any prior convictions, to which he vehemently denied. When confronted with [Maternal Grandfather's] allegations and background check, he continued to deny to undersigned that he had any conviction and he didn't recall any convictions that were contained in the background report. However, . . . this also appears to be untrue, with records showing Father having felony drug convictions and he spent time incarcerated in a state prison in North Carolina, receiving a sentence of at least three years.

Based on Father's numerous and continued lies, undersigned is extremely concerned. . . . Undersigned is extremely concerned that Father has perpetuated these falsehoods to cover up his conduct that is being alleged by Mother.

Court's Exhibit 4.

{¶ 28} Given that the GAL was aware of Father's continuous habit of lying, it is reasonable to assume that she believed that Father would lie when confronted with the allegations of abuse. In any event, Father was able to tell his side of the story when he testified before the court.

{¶ 29} Father also claims that the GAL's testimony should not have been permitted because there were material discrepancies between the GAL's reports and her testimony. However, after reviewing the record, we find no merit to this claim, as we found no material discrepancies.

12

**{¶ 30}** Upon review, we cannot say that Father's claims of bias and noncompliance with Sup.R. 48 are supported by the record. The record establishes that the GAL performed a thorough investigation, during which she spoke with several individuals and reviewed a number of relevant documents. The documents included criminal records and court pleadings from Catawba County, North Carolina, and Montgomery County, Warren County, and Shelby County, Ohio. The GAL also reviewed photographic evidence provided during the CPO proceedings in Ohio that corroborated the allegations of Father's physical abuse of A.N. In addition, the GAL retrieved and reviewed some of A.N.'s notebooks that evidenced extreme writing punishments that A.N. received from Father. Moreover, the GAL observed both a Zoom and in-person visit between Father and S.R., visited the home of Maternal Grandfather and his wife, and reviewed a 20-minute video walk-through of Father's home in North Carolina.

**{¶ 31}** Because there is no evidence of bias in the record and because the GAL performed a thorough investigation and showed a high level of knowledge about the case, we find that there are no exceptional circumstances nor any manifest injustice that warrants the application of the plain error doctrine. In fact, we find no error at all. Therefore, we do not find that the trial court erred plainly or otherwise by considering the GAL's testimony at the evidentiary hearing.

**{¶ 32}** Father's first assignment of error is overruled.

### Second Assignment of Error

**{¶ 33}** Under his second assignment of error, Father claims that the trial court erred by finding that he is an unsuitable parent. He asserts that the trial court's finding is against the manifest weight of the evidence. We disagree.

13

{¶ 34} "[T]he overriding principle in custody cases between a parent and nonparent is that natural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Hockstok*, 2002-Ohio-7208, ¶ 16. "This interest is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution." *Id*. "Since parents have constitutional custodial rights, any action by the state that affects this parental right, such as granting custody of a child to a nonparent, must be conducted pursuant to procedures that are fundamentally fair." *Id*. "To that end, before awarding legal custody of a child to a nonparent, the trial court must determine that the parent is unsuitable." *In re A.R.*, 2021-Ohio-2785, ¶ 25 (2d Dist.), citing *In re Perales*, 52 Ohio St.2d 89 (1977), syllabus. "This determination is 'a necessary first step in child custody proceedings between a natural parent and nonparent.'" *Id*., quoting *Hockstok* at ¶ 18.

{¶ 35} "A court may find that a parent is unsuitable if it finds, by a preponderance of the evidence, that the parent 'abandoned the child; contractually relinquished custody of the child; that the parent has become totally incapable of supporting or caring for the child; or that an award of custody to the parent would be detrimental to the child.'" *In re J.R.*, 2016-Ohio-5054, ¶ 8 (2d Dist.), quoting *Perales* at syllabus. "'"Detrimental" means some type of harm is or can be suffered by the child.'" *A.R.* at ¶ 26, quoting *In re M.N.*, 2016-Ohio-7808, ¶ 13 (6th Dist.). Therefore, "[c]ourts deciding a parent's 'suitability' under the final prong of that analysis should focus on 'the harmful effect of [parental] custody on the child, rather than [on] society's judgment of the parent.'" *In re R.D.B.*, 2019-Ohio-1547, ¶ 20 (2d Dist.), citing *Perales* at 98. Accordingly, the "'appropriate analysis is whether the natural [parent] is unsuitable as custodian, not whether someone else is more suitable.'" (Bracketed text in original and emphasis deleted.) *Id*., quoting *In re D.C.J.*, 2012-Ohio-4154, ¶ 58 (8th Dist.).

"'The parent, not the nonparent, is the focus in a suitability test.'" *A.R.* at ¶ 26, quoting *In re O.P.*, 2020-Ohio-4835, ¶ 16 (8th Dist.), citing *In re C.V.M.*, 2012-Ohio-5514, ¶ 15 (8th Dist.).

{¶ 36} "The standard of review we apply to a trial court's decision concerning child custody is abuse of discretion." *Cantrell v. Trinkle*, 2011-Ohio-5288, ¶ 35 (2d Dist.). "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 2013-Ohio-966, ¶ 34. An abuse of discretion most often involves an unreasonable decision that is not supported by a sound reasoning process. *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

{¶ 37} "Although a trial court possesses broad discretion in custody matters, the trial court does not have discretion to terminate a parent's right to custody where the suitability finding is unsupported by the record." *A.R.*, 2021-Ohio-2785, at ¶ 28 (2d Dist.), citing *In re B.P.*, 2010-Ohio-6458, ¶ 44 (4th Dist.), citing *Perales,* 52 Ohio St.2d 89 at syllabus. Again, the trial court must find by a "preponderance of the evidence" that the parent is unsuitable in order to grant custody to a nonparent. "A 'preponderance of the evidence' is 'evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it.'" *Cantrell* at ¶ 36, quoting *Black's Law Dictionary* (6th Ed. 1998).

{¶ 38} "When determining whether the trial court's decision concerning a parent's suitability is against the manifest weight of the evidence, 'we are guided by the presumption that the findings of the trial court are correct, since the trial court is best able to view the witnesses and observe their demeanor, gestures, and voice [inflections] and use these observations in weighing the credibility of the testimony.'" (Bracketed text in original.) *A.R.* at ¶ 29, quoting *Cantrell* at ¶ 36, citing *In re Jane Doe 1,* 57 Ohio St.3d 135 (1991). "When an award of custody is supported by competent, credible evidence, such an award will not

be reversed as being against the weight of the evidence." *Id.*, citing *Trinkle* at ¶ 36, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978).

{¶ 39} In this case, the trial court found that Father was unsuitable because the evidence indicated that he was physically and emotionally abusive. This finding is supported by Mother and the GAL's testimony. Mother testified that she was afraid of Father. She described him as a predator. Mother testified that Father was very controlling. She claimed that he did not let her contact her family and that he made her stay on the phone with him while he was away working as a truck driver. Mother testified that Father took S.R.'s half-sister A.N. with him on the road and abused her. Mother claimed that Father beat A.N. with hickory switches, made her sleep on the floor, and fed her only ramen as punishment.

{¶ 40} Mother also testified that Father punished A.N. by making A.N. write excessively in notebooks every day. Three of A.N.'s notebooks were admitted into evidence. The first notebook is a blue college ruled spiral notebook containing 120 pages with 31 lines on the front and back of each page. The notebook had the following sentence written on almost every single line of every single page: "I will stop talking lying stealing being sneaky spiteful hateful." Plaintiff's Exhibit 1; May 8, 2025 Hearing Tr. 16. The second notebook is a green college-ruled spiral notebook with 120 pages as well. That notebook was halfway filled with the exact same sentence on every line of every completed page. The third notebook is a smaller 70-page spiral notebook that contains just a few pictures and short sentences, such as "I found a flower" and "I love to play with my mom." Plaintiff's Exhibit 1.

{¶ 41} The GAL testified that A.N. told her she had at least 30 notebooks full of "lines" that Father forced her to write over and over as punishment. May 8, 2025 Hearing Tr. 12. A.N. also told the GAL that if she did not complete a certain number of pages on time, Father beat her.

16

{¶ 42} The GAL also testified that A.N. told her about other abuse by Father that was consistent with Mother's claims. For example, the GAL testified that A.N. told her that Father hit her with a hickory switch or a paddle as punishment and made her put her hands on the table while doing so. A.N. also told the GAL that Father fed her only ramen as punishment and said that heathens are not entitled to good food. The GAL also testified that A.N. had said that she sometimes had to steal food from the trash or the animals' pens, and that she occasionally got a good meal during a holiday or birthday or when her mom was working at McDonald's. The GAL further testified that A.N. told her that Father forced her to sleep on the floor at the foot of her bed.

{¶ 43} The GAL testified that A.N. corroborated Mother's claims of Father's controlling behavior. A.N. told the GAL that Father often took her to work with him in his truck and forced Mother to be on speaker phone with him at all times so that he could monitor Mother. The GAL also testified to reviewing the CPO that was filed to protect Mother and A.N. from Father and indicated that the evidence presented during those proceedings included photographs of injuries on A.N.'s body that were consistent with the physical abuse alleged by A.N.

{¶ 44} Although Father testified that he did not control Mother or abuse or punish A.N., the trial court found that Father was not credible in any respect for several reasons. One of those reasons was Father's sanction for making false allegations about his personal history in the North Carolina custody action. The court also relied on the several unresponsive, evasive answers that Father gave to simple personal questions at the evidentiary hearing. For example, the trial court found it troubling that Father could not remember basic information about his life, such as when or whether he was in the military. Also, when Father was asked about his criminal history, he admitted to having decades-old

convictions for conspiracy but could not remember whether he received a prison term, was fined, or was put on probation. After further prodding by the trial court, Father eventually testified that that he was placed in a "holding facility" for "three, four months, . . . five months, something like that" and then said that he was "not sure." May 8, 2025 Hearing Tr. 216.

{¶ 45} As we highlighted in our discussion of Father's first assignment of error, the GAL testified that Father continuously lied to her about his criminal record. The GAL testified that Father had several convictions for possession of drugs and possession of drugs with intent to distribute, which resulted in Father's incarceration. The GAL provided the following information with regard to Father's criminal past:

It appears that Father has previously been sent to the Department of Correction, Division of Prisons, in North Carolina in 1996, for three years as a result of a probation violation in Catawba County. It also appears he was sentenced to another three years in Iredell County in 1992 for selling a Schedule II drug, a Class H felony, with a second sentence out of Catawba County running concurrent. And the second case, possession with intent to sell a Schedule II drug, a Class H felony.

It appears Father may have had other records out of Catawba County, but based on a letter from the Deputy Clerk of the Superior Court of Catawba County, a number of their files were destroyed as by law including a number of cases such as DWIs, district criminal files and infractions from around 2017.

Court's Exhibit 4.

{¶ 46} Based on all the foregoing evidence, we find that there was competent, credible evidence to support the trial court's judgment finding that Father lacked credibility

18

and was an unsuitable custodian. Accordingly, we conclude that the trial court's judgment as to Father's unsuitability is not against the manifest weight of the evidence.

{¶ 47} Father's second assignment of error is overruled.

### Third Assignment of Error

{¶ 48} Under his third assignment of error, Father claims that the trial court erred by finding that legal custody in favor of Maternal Grandfather and D.N. was in S.R.'s best interest. Father contends that the trial court did not conduct a best-interest analysis as required by R.C. 3109.04(F) and failed to consider best-interest testimony that supported granting him legal custody of S.R. We disagree.

{¶ 49} "An award of legal custody 'vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.'" *In re J.C.*, 2020-Ohio-5540, ¶ 13 (2d Dist.), quoting R.C. 2151.011(B)(21). "Unlike an award of permanent custody . . . , '[a]n award of legal custody of a child does not divest parents of their residual parental rights, privileges, and responsibilities.'" (Bracketed text in original.) *Id*., quoting *In re C.R.*, 2006-Ohio-1191, paragraph one of the syllabus.

{¶ 50} "A juvenile court may award legal custody of a child to an individual if the court finds, by a preponderance of the evidence, that legal custody is in the best interest of the child." *Id*. at ¶ 14, citing *In re C.B.,* 2019-Ohio-890, ¶ 17 (2d Dist.). "When considering the best interest of the child, courts typically look to the factors found in R.C. 3109.04(F)(1)." *In re M.S.,* 2022-Ohio-3348, ¶ 38 (2d Dist.), citing *In re M.W.*, 2022-Ohio-2054, ¶ 13 (2d Dist.). "Notably, R.C. 3109.04(F)(1) does not limit courts to just the listed factors; courts

are permitted to consider 'all relevant factors.'" *In re C.N.*, 2016-Ohio-7322, ¶ 51 (2d Dist.). Some of the listed factors "include such things as the parents' wishes; the child's wishes, if the court has interviewed the child; the child's interaction with parents, siblings, and others who may significantly affect the child's best interests; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons." *In re D.S.*, 2014-Ohio-2444, ¶ 9 (2d Dist.), citing R.C. 3109.04(F)(1). "Those factors are similar to the factors in R.C. 2151.414(D) that govern permanent custody motions, and courts sometimes apply both provisions when considering legal custody." *M.W.* at ¶ 13, citing *In re A.K.*, 2017-Ohio-8100, ¶ 13-14 (2d Dist.).

{¶ 51} "While the trial court need not explicitly reiterate its findings with regard to each best interest factor under R.C. 3109.04(F)(1), it must be apparent from the record that the court considered the factors in its decision." *In re B. T-H.*, 2022-Ohio-4139, ¶ 11 (9th Dist.), citing *Herron v. Herron*, 2019-Ohio-5095, ¶ 8 (9th Dist.). "The trial court 'has discretion in determining which factors are relevant,' and 'each factor may not necessarily carry the same weight or have the same relevance, depending upon the facts before the trial court.'" *Krill v. Krill*, 2014-Ohio-2577, ¶ 29 (3d Dist.), quoting *Brammer v. Brammer*, 2013-Ohio-2843, ¶ 41 (3d Dist.).

{¶ 52} "An appellate court will not reverse an award of legal custody absent an abuse of discretion by the juvenile court." *J.C.* at ¶ 16. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *Darmond*, 2013-Ohio-966 at ¶ 34. "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). Because "[t]he knowledge a trial court gains through observing the witnesses

20

and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record[,] . . . the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." (Citation omitted.) *Id*.

{¶ 53} With the foregoing standards in mind, we find no abuse of discretion in the trial court's legal-custody determination when considering the relevant best-interest factors.

{¶ 54} *Parent's Wishes*: Mother testified that she was not fit to have custody of S.R. and that Father should not have custody nor any visitation due to his abuse of A.N. Mother testified that she wanted Maternal Grandfather and D.N. to have legal custody of S.R. Father agreed that Mother was not fit to have custody of S.R. and wanted S.R. to be in his custody. However, the evidence of Father's abuse of S.R.'s sibling, A.N., makes him unsuitable.

{¶ 55} *Child's Wishes*: S.R. was only four years old at the time of the legal custody proceedings. He also had a delay in speech that made it difficult for the GAL to understand him. Accordingly, there is nothing in the record indicating that S.R. made any express wishes regarding who should have legal custody of him.

{¶ 56} *Child's Interaction and Interrelationship with Parents, Siblings, and Others*: The record indicates that S.R. has a strong bond with Maternal Grandfather and D.N. Maternal Grandfather and D.N. took S.R. fishing and mushroom hunting, and they had bonfires together. They provided S.R. with his own room, television, and several indoor and outdoor toys. In contrast, S.R. does not know Father very well. Since S.R. was five months old, he has only had one in-person visit with Father. S.R. had weekly video calls with Father, which had become irregular for various reasons. Though there does not appear to be a clear bond between S.R. and Father, the record indicates that S.R. has recognized that Father is his "dad." S.R. has an established relationship with his half-sister A.N., who is cared for by Maternal Grandmother, and his potentially full-biological sister, S.N., who is cared for by

Mother's sister. While in Maternal Grandfather and D.N.'s care, S.R. has visited those siblings on a regular basis.

{¶ 57} *Child's Adjustment to Home, School, and Community*: The record indicates that S.R. has been living with Maternal Grandfather and D.N. for over two years and that they are the only caregivers S.R. knows. Maternal Grandfather and D.N. took S.R. to a daycare facility that provided preschool activities for S.R. Both Maternal Grandfather and D.N. testified that S.R. enjoys daycare. The GAL testified that the daycare providers told her that S.R. is a really good kid who always comes to school happy and clean. The daycare providers also told the GAL that they find S.R. to be very close with Maternal Grandfather and D.N.

{¶ 58} *Mental and Physical Health of All Persons Involved*: Mother has serious mental health and substance abuse issues that have persisted since she was a teenager. Father's convictions from the 1990's suggest that he also had issues with drugs. However, he had no recent convictions and tested negative for drugs during the legal custody proceedings. Maternal Grandfather was convicted of OVI in 2006 and 2007. Maternal Grandfather testified that those convictions stemmed from depression and anxiety after his first wife left him for another man. However, Maternal Grandfather testified that he went through counseling and moved on from that experience. He also testified that he sometimes drinks beer at home but does not go to bars anymore. D.N. was convicted of OVI in 2013 but does not drink often. Nothing in the record suggests that Maternal Grandfather and D.N. are not mentally and physically capable of caring for S.R.

{¶ 59} It is clear from the record that Maternal Grandfather and D.N. love S.R. very much and that S.R. has a strong relationship with them. The record also indicates that Maternal Grandfather and D.N. have provided S.R. with a safe home and have taken care

of all of his needs. It is also significant that Maternal Grandfather and D.N. have been open to allowing Father to have video calls with S.R. without any court order.

{¶ 60} Although the trial court did not go through a factor by factor best-interest analysis in its order granting legal custody to Maternal Grandfather and D.N., the language of the order nevertheless indicates that the trial court considered relevant factors and concluded that it was in S.R.'s best interest to award legal custody to Maternal Grandfather and D.N. Based on the record before this court, we cannot say that the trial court's best-interest determination was unreasonable or that the trial court's legal custody determination was an abuse of discretion

{¶ 61} Father's third assignment of error is overruled.

## Fourth Assignment of Error

{¶ 62} Under his fourth assignment of error, Father claims that the trial court erred by conducting an extrajudicial investigation for the purpose of finding court documents related to the custody action filed by Father in North Carolina and the Ohio CPO protecting Mother and A.N. and erred by admitting those documents into evidence. Father claims that these court documents should not have been considered by the trial court because neither party presented them as exhibits. When considering the circumstances of this case, Father's argument is not well taken.

{¶ 63} "Under the invited error doctrine, an appellant cannot attack a judgment for errors committed by himself or herself, for errors that the appellant induced the court to commit, or for errors into which the appellant either intentionally or unintentionally misled the court and for which the appellant was actively responsible." *State v. Champeau*, 2024-Ohio-4602, ¶ 13 (2d Dist.), citing *State v. Minkner*, 2011-Ohio-3106, ¶ 24 (2d Dist.). "Invited error has been found 'when a party has asked the court to take some action later claimed to be

23

erroneous, or affirmatively consented to a procedure the trial judge proposed.'" *State v. Fabian*, 2026-Ohio-1788, ¶ 84 (2d Dist.), quoting *State v. Campbell*, 2000-Ohio-183, ¶ 27.

{¶ 64} In this case, both parties advised the trial court on the record that they agreed it was important for the trial court to find the court documents in question. When the trial court asked if either party objected to the court taking a recess to find the court documents, neither party objected. Both parties agreed to the extrajudicial investigation that Father is complaining about in this appeal. Furthermore, after the trial court found the court documents and reviewed them with the parties, it specifically asked the parties whether they had any objection to the court admitting the documents into evidence. In response, neither party objected. Accordingly, both parties agreed to the admission of the court documents as well.

{¶ 65} Because Father agreed to have the trial court search for the court documents and consented to the admission of those records into evidence, under the invited error doctrine, Father cannot now claim that the trial court erred by doing so.

{¶ 66} Father's fourth assignment of error is overruled.

## Conclusion

Having overruled all four assignments of error raised by Father, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J., and EPLEY, J., concur.